HEANEY, Circuit Judge,
dissenting.
I.
I respectfully dissent. Viewing the facts in the light most favorable to Coleman, I believe that the district court correctly denied the administrators’ motion for summary judgment. While I do not quarrel with the brief statement of facts set forth by the majority, I believe it is necessary to supplement them to underscore the administrators’ bad faith.
It is, of course, undisputed that Ms. Coleman was convicted of Medicaid fraud in 1985. Nonetheless, six months into serving her *756 eighteen-month prison sentence, she received approval from the Minnesota Board of Teaching to resume her career as a teacher. While serving her sentence, Coleman obtained employment with the Shakopee School District and worked in that district for five years.[6] Nothing in this record indicates that her service with the Shakopee School District was anything other than satisfactory.
In 1990, Coleman applied for and was hired by the Minneapolis School District as an assistant principal intern. The record is silent as to whether Coleman was asked at that time if she had a prior felony conviction. She served the full year as an assistant principal intern. Again, there is nothing in this record to indicate that her service was anything other than satisfactory. The following year, Coleman was hired as an assistant secondary principal with the Osseo Public Schools. Again, there is nothing in the record to indicate that her service was anything other than satisfactory.
In 1992, Coleman returned to the Minneapolis School District as a principal at Lincoln Elementary School. Notably, Coleman was Lincoln’s fifth principal in just four months. When the Minneapolis School Board hired Coleman, there was significant opposition to her hiring. Several people sent letters urging that Coleman be removed as quickly as possible. One letter stated: “GET THAT GOD DAMN BLACK WID-DOW [sic] OUT OF THERE AS QUICKLY AS POSSIBLE!” [sic] (Appellee’s App. at 17.)
After serving as Lincoln’s principal for several months, on June 7, 1993, Coleman was contacted by Daniel Loewenson, the district’s human resources director. Loewenson asked Coleman to attend a meeting the next day with Associate Superintendent Katrina Reed and refused to disclose the purpose of the meeting. Loewenson did say, however, that Coleman could bring a union representative. Coleman brought her attorney. At the meeting, Reed told Coleman that someone “anonymously” informed the school district that Coleman had a prior felony conviction. Reed stated that she researched Coleman’s criminal record and confirmed the conviction.
Coleman did not dispute the criminal conviction or the fact that she wrote “N/A” on her employment application. Rather than respond to the trial by ambush, Coleman’s attorney requested a hearing on the matter. Reed allegedly responded that Coleman “had no right to any type of hearing.”[7] Reed informed Coleman that absent a resignation, Coleman would be terminated that evening at the Board meeting.
That evening, the Board met privately and voted to suspend Coleman for thirty days with pay and terminate her employment on July 12, 1993. After the private meeting ended, the Board then held a public meeting and announced that Coleman would be terminated. It is important to note that the Board’s agenda was printed on June 3, 1993, five days before the meeting actually took place, and specifically referred to Coleman’s “release.” At the public meeting, the Board did not specify the basis for Coleman’s termination and neither Coleman nor her attorney addressed the Board. Eventually, the Board publicized its “true” reasons for terminating Coleman and circulated an unsigned notice to *757 over 600 Lincoln elementary families and staff. It read:
STATEMENT RELATIVE TO JO COLEMAN,
PRINCIPAL,
LINCOLN ELEMENTARY SCHOOL
JUNE 9, 1993
Minneapolis Public Schools received and confirmed information that Lincoln Elementary Principal, Jo Coleman was convicted of a felony prior to being employed by the district and served time at the Shakopee Women’s Reformatory related to this conviction. The District was not made aware of the conviction by Mrs. Coleman at the time Mrs. Coleman was employed. The District has suspended Mrs. Coleman with pay while these and other matters are being further reviewed and addressed.
(Appellee’s App. at 31.) Because of confusion as to the source of the notice, the Board circulated a second notice, printed on Board letterhead. The second notice explained that the human resources office erroneously disbursed the first notice without first copying the notice onto official letterhead. Thereafter, Coleman brought suit. The district court denied the administrators’ motion for summary judgment on Coleman’s constitutional law claims.
II.
The majority concludes that the administrators provided Coleman with sufficient pre-termination process. I disagree. The majority cites Riggins v. Board of Regents, 790 F.2d 707, 711 (8th Cir.1986), for the proposition that an employer need not notify an employee prior to a pretermination hearing. Riggins is easily distinguishable. In Rig-gins, there was no doubt that the employee was aware of the allegations to be discussed at her pretermination hearing. See id. at 709. In this case, however, Coleman had no idea what the June 8 meeting would involve. Not only was Coleman “ambushed,”[8] but the administrators failed to follow their well-established policies for disciplining and/or terminating employees. The record reveals that whenever disciplinary action was contemplated, seven-day advance written notice was required. While the required notice was supposed to reflect the nature of the allegations and provide an opportunity for one to respond, the administrators did not comply with these requirements.
The record reveals an even starker display of bad faith in that the Board had already decided to terminate Coleman prior to the June 8, 1993 meeting. The Board’s agenda was printed on June 3, 1993, and it specifically referred to Coleman’s “release.” Moreover, the administrators’ bad faith is bolstered by Reed’s alleged comment that Coleman “had no right to any type of hearing.” “Even where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decision-maker is likely to be before the termination takes place.” Cleveland Board of Education v. Loudermill, 470 U.S. 532, 543, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (citations omitted).
In my view, a reasonable jury could conclude that Coleman was not provided proper pretermination notice, nor was- she allowed to “present [her] side of the story.” Id. at 543, 105 S.Ct. 1487. The majority states, however, that “[i]n addition to her meeting with Reed, Coleman had a second opportunity to respond to the charge against her____ However, Coleman did not utilize this second opportunity to ‘present [her] side of the story.’ ” Ante at 754, (quoting Loudermill, 470 U.S. at 546, 105 S.Ct. 1487). Reed allegedly told Coleman that if Coleman did not immediately resign, she would be terminated at *758 the Board meeting. Loudermill contemplates “proposed action” against an employee before termination. 470 U.S. at 546, 105 S.Ct. 1487. While Coleman may not be entitled to the hearing of her choice, the Constitution demands that she be given meaningful notice and an opportunity to respond. Consequently, because a reasonable jury could conclude that the administrators had decided to terminate Coleman before providing a proper pretermination hearing, the district court properly denied the administrators’ summary judgment motion.
III.
I also believe that there is a fact issue as to whether the appellants deprived Coleman of a liberty interest without due process. Coleman argues that the administrators distributed two notices concerning her conviction, prison term, and employment termination, to over 600 Lincoln elementary families and staff, without providing her prior notice or a meaningful opportunity to respond.
In my view, there is no question that the administrators made “charge[s] against [Coleman] that might seriously damage [her] standing and associations in [her] community.” Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). “Where a person’s good name, reputation, honor, or integrity is at stake because of what the government is doing to [her], notice and an opportunity to be heard are essential.” Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). The majority concedes that the reasons given for Coleman’s discharge stigmatized her and that the administrators made those reasons public. The majority concludes, however, that Coleman had an affirmative obligation to deny the charges.
The problem with the majority’s reasoning is that Coleman did not have an opportunity to deny the charges. The administrators released two notices about Coleman’s past after they provided Coleman with her so-called pretermination hearing. Without informing Coleman, the administrators released the first stigmatizing notice about Coleman on June 9,1993, the day after Coleman was informed that she would be terminated. On June 10, 1993, the appellants released the second stigmatizing notice. The fact that the administrators released the damning notices after they had already decided to terminate Coleman is no great surprise since the administrators apparently did not believe that Coleman was entitled to any type of process in the first place. Although their actions come as no great surprise, they are still unconstitutional and I would affirm the district court.
IV.
Finally, the majority determined that it need not decide whether the administrators were entitled to qualified immunity because Coleman’s suit failed to allege that they had violated a clearly established constitutional right. Having already concluded that the administrators violated Coleman’s constitutional rights, I now turn to whether the officials are entitled to qualified immunity.
Generally, qualified immunity is available for “government officials performing discretionary functions ... insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted). In determining whether the administrators’ conduct entitles them to such immunity, we look to whether it was objectively reasonable. Schleck v. Ramsey County, 939 F.2d 638, 641 (8th Cir.1991) (citation omitted). In this regard, I agree with the district court when it stated:
The evidence in this case suggests that the individual defendants were quite familiar with the Loudeimill notice and hearing requirements; they had actually participated in such proceedings during the ... period of time that plaintiff was employed with the District. In fact, just one month earlier in May, 1993, the individual defendants had provided plaintiff with these same protections during disciplinary proceedings against her. Any assertion by the individual defendants that they did not know plaintiff was entitled to such protec *759 tions upon termination are simply incredulous in light of their prior actions.
Coleman v. Reed, 959 F.Supp. 1112, 1121-22 (D.Minn.1997). Applying the standard of objective reasonableness to the administrators’ actions in this case clearly compels the conclusion that they do not enjoy qualified immunity.
V.
For the reasons stated above, I believe that there are fact issues warranting a trial and the administrators are not entitled to qualified immunity. Therefore, I would affirm the district court and allow Coleman to proceed with a trial on the merits.

. The Shakopee School District was, of course, fully aware of Coleman’s conviction since it hired Coleman while she was in prison. When Coleman applied for the principal position at Lincoln, she listed Shakopee Public Schools as a reference. Specifically, she listed Joane Block as her Shakopee reference. (See Appellant's App. at 31.) The record is silent as to whether Minneapolis school officials ever contacted Ms. Block or anyone in the Shakopee school system. Thus, we do not know whether Minneapolis school officials, including the administrators, knew about Coleman's previous incarceration. If they had contacted Shakopee officials as part of their "due diligence” before hiring Coleman, it is hard to imagine that this subject did not come up.

. The record indicates that whenever the school board and/or school administration contemplated disciplinary action, such actions were preceded by seven day advance written notice. The notice stated the nature of the allegations and provided an opportunity for a response. For example, on May 7, 1993, Associate Superintendent Betty Webb sent Coleman a notice of deficiency indicating that Coleman had not handled herself properly when disciplining a student. Coleman was provided the above-mentioned procedural safeguards as they relate to the May 7, 1993 deficiency notice.

. The majority cites Demming v. Housing & Redevelopment Authority, 66 F.3d 950, 953 (8th Cir.1995), in support of its conclusion that Coleman was not "ambushed.” Demming is inapposite. In Demming, similar to Riggins, the employee was well aware of the hearing subject matter. For example, Demming “knew the board was in the process of reviewing her performance” before her pretermination hearing. Demming, 66 F.3d at 953. Unlike the employees in Demming and Riggins, the majority is unable to show that Coleman was even remotely aware of the reason for the June 8 "pretermination hearing.”